**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COUNTY OF MERCER ,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION NO. 06-799** |
| **v.** | ) |
| | ) |
| **UNILECT CORPORATION,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

CONTI, District Judge.

*Introduction*

The instant action arises out of a dispute involving a contract for the purchase of voting

machines by Mercer County, Pennsylvania ("Mercer" or "plaintiff") from UniLect Corporation

("UniLect" or "defendant"). Pending before the court are the parties' cross-motions for summary

judgment concerning whether UniLect breached a contractual duty allegedly owed to Mercer to

maintain the voting machines in accordance with Pennsylvania certification standards. Plaintiff

commenced this action in the Court of Common Pleas of Mercer County, Pennsylvania, and the

action was removed to this court on June 16, 2006. On July 21, 2006, UniLect filed a motion to

dismiss (Doc. No. 4), which the court granted in part and denied in part. Mercer's sole pending

claim is for breach of contract, predicated on an alleged breach of an express warranty. Mercer

moved for partial summary judgment on April 1, 2008 (Doc. No. 24), and UniLect moved for

summary judgment that same day (Doc. No. 28). After considering the joint statement of facts

and the other submissions of the parties, viewing all disputed facts in favor of the opposing party,

and drawing all reasonable inferences in favor of the opposing party, plaintiff's motion for partial

summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## *Background*

The material facts of this case are not seriously disputed. On December 11, 2000, UniLect offered a written proposal (the "Proposal") to Mercer to provide Mercer with the Patriot voting system (the "Patriot"), a touch screen electronic voting system or direct electronic recording voting system ("DRE"). (UniLect's Joint Statement of Undisputed Facts ("J.S.Def.") (Doc. No. 42) ¶ 1; Mercer's Joint Concise Statement of Material Facts ("J.S.Pl.") (Doc. No. 41) ¶¶ 3, 4.) The Proposal had seven parts (Def.'s App. (Doc. No. 40) Ex. 4.) Part four was entitled "INSTALLATION, TRAINING, WARRANTY AND MAINTENANCE." (Def.'s App. Ex. 4 at 8.) Among the services covered under part four of the Proposal was training for plaintiff's staff:

> Training of your in-office election staff, all poll workers and repair support staff. This includes instruction on "how to code and tally" all in-precinct votes as well as absentees. To the extent possible, we will aid in your voter training.

(Id.) Another covered service was a software support service:

> Our on-going software support and maintenance fee package is available at no cost for the first year. This includes all software maintenance, software upgrades, State mandated changes and our "Quick-Support Program." Each additional year is automatically billed to you at the rate of $6,000 per year. We are able to offer these low maintenance figures because of the solidity of our products. Maintenance increases will be limited to Consumer Price Index increases.

(Id.) The covered services also included a "One-Year manufacturer's warranty on all equipment (parts and labor)." (Id.) The warranty provision further provided:

UniLect warrants the products, as delivered, will conform with and perform according to the specifications required by the State of Pennsylvania as well as conform with and perform according to the specifications in this proposal and any contract arising therefrom. If any programs should not so perform, they shall be corrected or replaced by UniLect in a timely manner as mutually agreed.

(Id. at 9.)  The warranty provision added: "Any custom software features/changes will be offered on an as-needed, time-and-materials contract basis."  (Id.)  Finally, part four of the Proposal provided for limited maintenance and service:

Our one-year equipment warranty is strictly limited to repair or replacement in a timely manner and covers both parts and labor.

After the first year, we suggest that you handle hardware maintenance on a time and materials basis.  If desired however [sic], we will quote a price for all hardware maintenance on an annual basis.

(Id.)

Part five of the Proposal was entitled "ADDITIONAL COMMENTARY."  (Id. at 10.) Part five's provisions included the following:

•There is a full, all inclusive, warranty for one-year on all hardware (parts and labor) and software in the system.  The number of our staff members (local as well as home office) will be as many as you and ourselves require to do the job.  During the first year this is at no additional cost.  Additional software support and license fees are mentioned elsewhere in this proposal.

. . .

•There really is no end to the life of the product because bad parts are replaced with good parts.  Certainly 20-25 years could be attainable.  The proof of reliability is the fact that the parts used in the PATRIOT have all been used in the hundreds of thousands and even millions, including such diverse fields as lap-top computers, jet fighters, state lotteries, field survey teams and restaurants to name a few.  We purposely did not utilize untested

3

new parts in our design of the PATRIOT.

> •The PATRIOT is a stand-alone product and no upgrades are contemplated at this time.  As software enhancements are made, they will be offered at no additional cost because you will be under our software maintenance contract.  There probably will, however, be future add-on projects (hardware and/or software) which will augment the usage of the PATRIOT system.  These items are on the drawing board now, however, no costs or timetable, have been assigned.  We will be happy to discuss this with you, if you desire.

(Id. at 10-11.)

Part six of the Proposal was entitled "PRICING."  (Id. at 13.)  Under the heading "Precinct and Central Office Hardware and Software," the Proposal stated "[a]s mentioned earlier, there is a complete one-year warranty on all hardware and software that applies to the PATRIOT Voting System.  After that, the following annual costs apply. . . ."  (Id.)  Part six of the Proposal provided under the heading "Software Maintenance and License Contract":

> (annually after warranty year)                                    $6000

> This includes all 800 number service and "Quick-Support" modem service as well as all upgrades and State mandated changes.

> There is no need to incur a software coding charge because we train you to do this yourself.  Naturally, we will be available to do coding for you if you wish us to do that.  The cost would depend on the size of the election.

(Id.)  Under the heading "Equipment Maintenance," part six provided that "[w]e suggest that you elect to have equipment repair conducted on a time and piece part basis.  If desired, however, we can offer you a fixed price contract."  (Id.)

On January 25, 2001, Mercer and UniLect entered into a contract agreement, in which UniLect agreed to furnish and install a DRE for Mercer for $870,500.00, later increased to

897,000.00.[1]  (J.S.Def. ¶¶ 2, 4; J.S.Pl. ¶ 6; Def.'s App. Ex. 3.)  The agreement incorporated by reference the provisions of the written Proposal.  (J.S.Def. ¶ 3.)   The agreement also contained an integration clause.  (J.S.Def. ¶ 5.)

The Patriot was first certified for use in Pennsylvania elections in 1994 pursuant to 25 PA. CONS. STAT. § 3031.7.  (J.S.Def. ¶ 11; J.S.Pl. ¶ 9.)  In 1999, the Patriot was re-certified without an examination after the Patriot voting system was modified.  (J.S.Def. ¶ 13; Def.'s App. Ex. 1.) The voting system was delivered to Mercer on or around April 2001.  (J.S.Def. ¶ 21.)  On the date of delivery, three members of Mercer's board of commissioners, Olivia Lazor, Brian Shipley, and Cloyd Brenneman, considered that the Patriot was certified for use in Pennsylvania in accordance with the applicable Pennsylvania law, i.e. section 3031.7.  (J.S.Def. ¶ 14; Olivia Lazor's Deposition at 57-60; Brian Shipley's Deposition at 65-66; Cloyd Brenneman's Deposition at 30-31.)  Mercer's election director, James Bennington, also believed the Patriot was certified as of its delivery.  (J.S.Def. ¶ 15; James Bennington's Deposition at 30-31.)

The Patriot was used by Mercer without incident after the time of its delivery in April 2001, until November 2004.  (J.S.Def. ¶ 21.)  During the November 2004 election, problems were experienced by Mercer with the Patriot.  (J.S.Def. ¶ 22.)  After that election, a group of nineteen registered voters residing in Beaver County, Pennsylvania, requested that the Commonwealth of Pennsylvania conduct an examination of the Patriot under 25 PA. CONS. STAT. § 3031.5(a).  (J.S.Def. ¶ 23; J.S.Pl. ¶ 11.)  The Commonwealth of Pennsylvania granted

---

[1]The purchase price under the written agreement was $870,500.00.  (J.S.Pl. ¶ 1.)  Mercer purchased ten additional control units which increased the total purchase price for the voting system to $897,000.00.  (J.S.Pl. ¶ 6.)  The agreement to purchase the additional units was not reduced to writing.  The parties, however, do not dispute that the total purchase price was $897,000.00.  (J.S.Def. ¶ 4; J.S.Pl. ¶ 6.)

the request and conducted an examination in 2005; on April 7, 2005, the Commonwealth decertified the Patriot. (J.S.Def. ¶¶ 24, 25; J.S.Pl. ¶ 12.) By reason of the decertification, the Patriot could no longer be used in Pennsylvania elections. (J.S.Def. ¶ 26; J.S.Pl. ¶ 13.)

After decertification, agents of UniLect represented to agents of the Commonwealth of Pennsylvania and Mercer that UniLect would make its best efforts to obtain re-certification of the Patriot. (J.S.Pl. ¶ 14.) The Patriot was re-examined on April 22, 2005, and certification was again denied on May 6, 2005. (J.S.Pl. ¶¶ 15, 16.) UniLect requested a third and final examination, which was conducted on August 15, 2005. (J.S.Pl. ¶ 17.) For the third time, certification of the Patriot was denied on October 21, 2005. (J.S.Pl. ¶ 18.) On March 15, 2006, UniLect sent Mercer a letter informing Mercer that UniLect had given up its effort to obtain certification for the Patriot, and that the Patriot could no longer be used in any public election in the United States. (J.S.Pl. ¶ 28; Pl.'s App. (Doc. No. 27) at 52a.)

Dr. Michael Ian Shamos ("Shamos"), who was the examiner appointed by the Commonwealth of Pennsylvania to evaluate the Patriot, testified that the requirements of certification are constantly changing. (Def.'s App. Ex. 8 at 13-15.) In the report Shamos issued after the February 15, 2005 evaluation, he specifically discussed the evolution of the certification standards that occurred after 1990. (Def.'s App. Ex. 8 at 2.)

As a result of a decertification of the Patriot, Mercer had to rent voting machines that complied with Pennsylvania's statutory requirements for subsequent elections. The cost of renting these machines was $207,474.04. (J.S.Def. ¶ 30.) In 2007, Mercer purchased a new DRE voting system that was certified for use in Pennsylvania for the sum of approximately $981,885.00. (J.S.Def. ¶ 32.)

Mercer entered into two settlement agreements with the Commonwealth of Pennsylvania, under which Mercer recovered one-hundred percent of the costs it expended for renting voting machines after the Patriot was decertified. (J.S.Def. ¶ 31.) In addition, Mercer received grants from the federal government under the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301 *et seq.* By October 2005, Mercer received a total of $1,288,143.70 under the HAVA grants. A significant proportion of the money received from the grants was used to the pay for the replacement DRE. (J.S.Def. ¶¶ 33, 34.)

On May 17, 2006, Mercer filed a complaint against UniLect alleging two counts, breach of express warranty and breach of implied warranty. (J.S.Def. ¶ 27.) The breach of express warranty claim was based upon the warranty set forth on page 9 of the Proposal that provided:

> UniLect warrants the products, as delivered, will conform with and perform according to the specifications required by the State of Pennsylvania as well as conform with and perform according to the specifications in this proposal and any contract arising therefrom. If any programs should not so perform, they shall be corrected or replaced by UniLect in a timely manner as mutually agreed.

(Def.'s App. Ex. 4 at 9.) Mercer did not dispute that the Patriot conformed to the specifications in the Proposal; Mercer solely contended that under the "certification warranty," UniLect promised that the Patriot would conform with and perform according to Pennsylvania's specifications for the expected life of the product, and if at any time during its life expectancy the Patriot did not so conform or perform, UniLect would correct or replace the system. (J.S.Def. ¶ 10.) UniLect filed a motion to dismiss both counts. The claim of breach of implied warranty was dismissed by this court on November 29, 2006. (J.S.Def. ¶ 28.) With respect to the motion to dismiss the claim of breach of express warranty, the court denied the motion without

prejudice.  (Id.)  The motions for summary judgement at issue here were filed by both parties, each asserting that as a matter of law judgment should be rendered in that party's favor with respect to plaintiff's breach of express warranty claim.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party").  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted.  Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## *Discussion*

Both plaintiff and defendant seek summary judgment on the plaintiff's claim of breach of express warranty. Both parties assert that there is only one reasonable interpretation of the language establishing the warranty, and they both argue that the other's interpretation is unreasonable. In addition, defendant argues that plaintiff's claim is time barred by the statute of limitations, and that plaintiff is entitled to no or nominal damages.

**A.      Duration of the "Certification Warranty"**

**1.      Even if the language of the certification warranty is interpreted as Mercer suggests, there was no warranty for certification of the Patriot beyond the date of delivery.**

An express warranty may be created by a seller of goods.

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

13 PA. CONS. STAT. § 2313(a). In creating an express warranty, it is not necessary that a seller

"use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." Id. § 2313(b). Opinion statements, however, do not indicate an intent to make a warranty. "[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Id. In order for Mercer to succeed on its claim for breach of express warranty, Mercer must prove that UniLect made an affirmation of fact or promise relating to the Patriot, which became part of the basis of the bargain between Mercer and UniLect. Mercer must also prove that the product did not conform to the affirmation or promise.

Mercer claims that UniLect created an express warranty relating to the Patriot continuing to meet the certification requirements of Pennsylvania by making a promise to ensure that the Patriot retained its certification for the minimum expected life of the system, twenty to twenty-five years. Mercer refers to this promise as the "certification warranty." Mercer argues that the certification warranty arises from the following language:

> UniLect warrants the products, as delivered, will conform with and
> perform according to the specifications required by the State of
> Pennsylvania . . . . If any programs should not so perform, they
> shall be corrected or replaced by UniLect in a timely manner as
> mutually agreed.

(Def.'s App. Ex. 4 at 9.) UniLect differently interprets this language. The parties do not dispute that the warranty required the Patriot to be certified; nor do the parties dispute that UniLect had the obligation to correct or replace the system if it was not certified. Rather, the parties dispute whether UniLect promised to ensure the Patriot remained certified, and, if so, the "the length or duration of such warranty." (Pl.'s Mem. of Law in Supp. of Summ. J. (Doc. No. 25) at 5.)

Under Pennsylvania's Uniform Commercial Code, 13 PA. CONS. STAT. §§ 1101 *et seq.*,

the breach of an express warranty occurs on the date the good is delivered, unless the warranty is explicitly extended to future performance:

> (a) General rule. An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

> (b) Accrual of cause of action. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods* and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

13 PA. CONS. STAT. § 2725 (emphasis added). Professors White and Summers have commented that an "extension of the normal warranty period does not occur in the usual case, even though all warranties in a sense apply to the future performance of goods. [Section 2725(b)] applies only in cases in which the warranty 'explicitly extends to future performance.'" 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 11-9 (5th Ed. 2006). Although section 2725 concerns the statute of limitations, which is a procedural issue, an action claiming failure to comply with an express warranty after the date of delivery without an explicit extension of that warranty to future performance, even if pled timely, would be inconsistent with section 2725.[2]

At least one court has treated section 2725 as a "a substantive rule, precluding as a matter of law any finding that a breach of warranty can occur on any other date than the date of delivery." See

---

[2]In defendant's motion for summary judgment, it argued that plaintiff's claim is time barred. In response, plaintiff argues that the statute of limitations does not apply to its action, under Pennsylvania's doctrine of "nullum tempus occurit regi," which means "time does not run against the king." Montgomery County v. Microvote Corp., 320 F.3d 440, 445 (3d Cir. 2003). The court need not address that issue because defendant's interpretation of the contract is the only reasonable interpretation.

<u>Rolls Royce Motor Cars, Inc. v. Houston Tractor Equip., Inc.</u>, No. C14-90-00606-CV, 1992 WL 5546, at *5 (Tex. App. Jan. 16, 1992).[3]

Pennsylvania courts apply a similar analysis. In <u>Patton v. Mack Trucks, Inc.</u>, 519 A.2d 959 (Pa. Super. Ct. 1986), a truck manufactured by the defendant spun out of control allegedly due a defective steering mechanism, killing the driver and injuring the passenger. <u>Id.</u> at 960-61. At the time of the accident, the truck was owned by the employer of both the driver and passenger, and the two were acting within the scope of their employment. <u>Id.</u> The plaintiffs alleged that when the manufacturer sold the truck to the employer, the manufacturer made express and implied warranties. <u>Id.</u> at 961. The plaintiffs sued for breach of those warranties for failing to design and manufacture properly the truck and its steering mechanism. <u>Id.</u> The defendant represented and warranted that "all articles and services covered by this purchase order meet or exceed the regulations established and promulgated under the Federal Occupational Safety and Health Law, Public Law 91-596 . . . in effect or proposed as of the date of this order." <u>Id.</u> at 962. The plaintiffs argued the truck failed to meet the applicable standards. Although the <u>Patton</u> case was decided in the context of a statute of limitations issue based upon 13 PA. CONS. STAT. § 2725, the court had to "construe . . . the purchase agreement between [the defendant] and [the employer]" and determine whether the agreement required the truck to comply with the regulations only on the date of delivery, or comply with the regulations after the date of delivery as well. <u>Id.</u> at 962. The court explained that the "parties must make a 'clear and unambiguous expression' of their intent to extend warranties to cover future performance," if that is their true

_____

[3]Decisions from other jurisdictions interpreting the provisions of the Uniform Commercial Code may be considered in interpreting the same provisions of Pennsylvania's Uniform Commercial Code. 1 PA. CONS. STAT. § 1927.

intention.  Id. at 964 (citing Ranker v. Skyline Corp., 493 A.2d 706, 709 (Pa. Super. Ct. 1985)).

The court held that the language of this particular warranty was not an explicit, unambiguous,

and clear expression of the intent to extend coverage to future performance.  Id. at 963-65.

In Cucchi v. Rollins Protective Services Co., 574 A.2d 565 (Pa. 1990), the Supreme

Court of Pennsylvania cited Patton's analysis with approval: "[w]e agree that the warranty given

in Patton did not explicitly extend to future performance and that, therefore, the breach of

warranty occurred when tender of delivery was made, not when the actual breach was or should

have been discovered."  Id. at 573.  The supreme court also noted that in order to make

"warranties explicitly extending to future performance," the content and circumstances must be

"sufficiently specific as to unequivocally refer to future performance."  Id.

Under Patton and Cucchi, the duration of a warranty does not ordinarily extend beyond

the date of delivery.  Here, the issue is whether this is an extraordinary case in which the duration

of the certification warranty explicitly extends to future performance.

The prepositional phrase "as delivered," as used in the certification warranty in this case,

could arguably be in reference to the warranty that follows the phrase.  Using that reference for

the interpretation, the court concludes the Patriot was warranted to comply with Pennsylvania

specifications *on the date of delivery*.  Mercer argues that the phrase "as delivered" could

arguably be a reference to the specific voting system subject to the warranty that followed and

that the warranty was not limited in duration.  This contention, however, is misplaced when the

context of that language in the Proposal is considered.  Even if the phrase is read as a reference to

those machines, which when delivered composed the Patriot, the certification warranty provided:

> UniLect warrants the [Patriot] will conform with and perform

13

> according to the specifications required by the State of
> Pennsylvania . . . . If any programs should not so perform, they
> shall be corrected or replaced by UniLect in a timely manner as
> mutually agreed.

(Def. App. Ex. 4 at 8.) The warranty does not contain an explicit, unequivocal, or specific expression of an intent to guarantee that the Patriot will meet certification standards after the date of delivery. The certification warranty does not contain an unequivocal reference to any date, let alone a date in the future.[4] The "timely manner" language concerns only the remedy, i.e. correction or replacement, and not the warranty itself.

Other warranties in the Proposal explicitly extend to one year after tender of delivery, but the certification warranty does not.[5] The statement concerning the twenty to twenty-five year potential life expectancy of the Patriot, contained in part five of the Proposal, cannot be considered an explicit reference to a future date for purposes of the certification warranty contained in part four of the Proposal. The statement regarding the possible life expectancy was contained in a separate part of the Proposal, concerned the mechanics of the system, was made in the context of technology used by the system being common and the pieces of hardware used being abundant and easily replaceable, and made no mention of the certification warranty or the

---

[4]In certain other jurisdictions, the courts have recognized that future performance is not warranted unless the warranty refers to a specific date in the future. See, e.g., Safeway Stores, Inc. v. Certainteed Corp., 710 S.W.2d 544, 548 (Tex. 1986) ("For an express warranty to meet the exception [of section 2725(b)], it must make specific reference to a specific date in the future"). The Pennsylvania Supreme Court, as noted previously, required that the content must be "sufficiently specific as to *unequivocally* refer to future performance." Cucchi, 574 A.2d at 573 (emphasis added).

[5]Mercer concedes that the one year durational limit of other warranties in the Proposal does not apply to the certification warranty. (Pl.'s Mem. of Law in Supp. of Summ. J. (Doc. No. 25) at 7.)

certification requirements of Pennsylvania law.  Under those circumstances, the court concludes

that no reasonable finder of fact could find that statement to be anything other than puffery.[6]

The statement regarding potential life expectancy of the system is similar to a statement

in product literature that was at issue in Jones & Laughlin Steel Corp. v. Johns-Manville Sales

Corp., 626 F.2d 280 (3d Cir. 1980).  The literature was given to the plaintiff during preliminary

negotiations, and it declared that defendant's products were "still performing satisfactorily after

more than forty (40) years."  Id. at 291.  The plaintiff argued that the statement established an

explicit extension of certain warranties.  The Court of Appeals for the Third Circuit called this

statement a "boast" that "may not reasonably be relied on by [the plaintiff] as explicit extensions

of any warranty to cover the future performance of the product."  Id.

Mercer argues that the language of the Proposal is "replete with representations beyond

the language of the 'certification warranty' which would lead any reader to conclude that

problems with hardware, software, and certification would be able to be corrected by UniLect so

as not to render the voting system useless."  (Pl.'s Mem. of Law in Supp. of Summ. J. (Doc. No.

25) at 7-8.)  Mercer, however, did not point to any specific language that either expresses or

---

[6]Although the statement that the parts of the Patriot have been used in other devices is an affirmation of fact, the statement that the Patriot "could" be operable for twenty to twenty-five years is not.  The statement with respect to the life expectancy is an opinion, which is puffery.  A conditional statement that a product "could" do something is a statement of opinion, not fact.  See Gillette Co. v. Norelco Consumer Prods. Co., 946 F.Supp. 115, 137 (D.Mass. 1996) (the statement "anything closer could be too close for comfort" was not actionable as a false or misleading advertisement, since the statement was an opinion; a statement that is an opinion, as opposed to an affirmation of fact, is puffery); Hobson Constr. Co. v. Hajoca Corp., 222 S.E.2d 709, 712 (N.C. Ct. App. 1976) ("The statements of [the defendant's] manager to plaintiff to the effect that the apparatus 'should' be able to remove iron and manganese from the water did not amount to an affirmation of fact effecting (sic) the bargain between plaintiff and [the defendant].").

implies that there was a warranty to that effect.  The Proposal did not unequivocally refer to future performance concerning certification.  Mercer's claim of breach is not based upon a warranty that the system would or could be corrected so as to not render it useless; Mercer's claim of breach is based upon an alleged warranty to correct or replace the Patriot in order to comply with specifications that changed under Pennsylvania law after delivery.

If the warranty at issue in this case would be interpreted as Mercer contends, the warranty would be similar to the warranty at issue in Patton, which provided that the product would meet certain regulations without specifying a date as to when the product would meet those regulations.  The court notes that Mercer's argument that the failure to extend the certification warranty into the future renders the Patriot useless is nearly identical to that raised by the plaintiffs in Patton.  There, the plaintiffs argued:

> the trial court rendered the warranty language meaningless when it held that the warranty did not 'implicitly extend' to future performance of the truck.  They point out that [the defendant], in effect, warranted to provide [the employer] with a workplace that conformed to existing federal safety standards.  Mack's warranty had meaning, according to [the plaintiffs'] analysis, only if it extended into the future to cover the period during which the truck actually served as a workplace for [the employer's] employees.

Patton, 519 A.2d at 963.  The Pennsylvania Superior Court rejected these arguments and held, as a matter of law, that the warranty in Patton did not cover a breach of the regulations on a date after tender of delivery.  Similarly, the certification warranty in this case, where there is no *unequivocal* reference to future performance, cannot cover a failure of the Patriot to meet Pennsylvania specifications which changed after the date the Patriot was delivered.  Cucchi, 594 A.2d at 573.

16

In this case, there is no evidence that the Patriot, on the date of the system's delivery, did not conform with or perform according to the Pennsylvania specifications in effect at the time, and there is no evidence that the Patriot had any latent defects upon delivery. Mercer used the Patriot from April 2001 to November 2004 without any issue concerning certification. A number of Mercer's own officials testified that they believed the Patriot met the certification requirements at that time. (J.S.Def. ¶¶ 14, 15; Olivia Lazor's Deposition at 57-60; Brian Shipley's Deposition at 65-66; Cloyd Brenneman's Deposition at 30-31; James Bennington's Deposition at 30-31.) Under those circumstances, summary judgment must be granted in defendant's favor with respect to plaintiff's claim of breach of express warranty.

## 2. UniLect's interpretation is the only reasonable interpretation of the warranty.

In this case, as discussed above, the certification warranty does not provide coverage for future performance under Pennsylvania law. Even assuming there was no requirement that the warranty must *explicitly* guarantee future performance in order to create a warranty that the product will perform after tender of delivery, the certification warranty did not extend to future performance because the contract is subject to only one reasonable interpretation.

Mercer argues that the contract does not expressly limit the duration of the certification warranty. Mercer notes that the limited duration of other warranties provided by the contract, such as the one-year hardware and software warranty, do not relate or apply to the certification warranty. Mercer argues that an interpretation of the certification warranty which would limit its duration is commercially unreasonable, since it is unconscionable to conclude that the purchaser would be without remedy in the event the system is rendered useless after a relatively short

period of time.

In contrast, UniLect argues that the certification warranty is limited to the moment of delivery, based upon the words "as delivered," and that there was no promise that the Patriot would remain certified if the standards or requirements for certification changed. UniLect asserts that Mercer's interpretation is commercially unreasonable, because a manufacturer of products that incorporate computer technology would not, and cannot, offer an open-ended warranty without any durational limit. UniLect also asserts that Mercer's interpretation is commercially unreasonable, because UniLect cannot predict future changes in Pennsylvania's requirements for DREs, and would therefore not offer a warranty to modify its product to meet those changes.

The goal of contract interpretation is to determine the mutual intent of the parties. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995). Under Pennsylvania law, contracts are interpreted in accordance with the plain meaning rule, which assumes that the intent of the parties to an instrument is "embodied in the writing itself." Id. (quoting Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994)). If the writing on its face is clear and unambiguous, the parties' mutual intent is found only in the express language of the agreement. Atkinson v. LaFayette College, 460 F.3d 447, 452 (3d Cir. 2006). If the writing is ambiguous, the fact finder may examine extrinsic evidence in order to determine the intent of the parties. Duquesne Light Co., 66 F.3d at 613.

A contract is ambiguous only if the language is fairly susceptible to different constructions or capable of being understood in more senses than one. Id. Different interpretations by the parties does not necessarily render the contract ambiguous. Id. If the contract "is subject to only one reasonable interpretation," it is unambiguous, and summary

judgment is appropriate. <u>Atkinson</u>, 460 F.3d at 452 (quoting <u>Arnold M. Diamond, Inc. v. Gulf</u> <u>Coast Trailing Co.</u>, 180 F.3d 518, 521 (3d Cir. 1999)). To determine if an ambiguity exists, the court is to consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." <u>Mellon Bank,</u> <u>N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir. 1980).

In this situation, the parties differently interpret the language of the Proposal. As noted, those different interpretations, alone, do not make the contract ambiguous. Each party also claims its interpretation is the only reasonable interpretation.

UniLect's interpretation of the Proposal is commercially reasonable, whereas Mercer's interpretation is commercially unreasonable. Mercer's interpretation is commercially unreasonable for two reasons: (1) it relies upon mere puffery, and (2) it requires UniLect to warrant that the Patriot will comply with unknown certification standards that will be imposed in the future.

First, Mercer's interpretation relies upon puffery to establish the duration of the certification warranty. For reasons already explained, the statement about the life of the Patriot is an expression of an opinion, and not an affirmation of fact. Opinion statements do not create express warranties. <u>See, e.g.,</u> <u>Anderson v. Bungee International Mfg. Corp.</u>, 44 F. Supp. 2d 534, 541 (S.D.N.Y. 1999) (statements that "the Bungee cords are of premium or superior quality are generalized statements of salesmanship and are indistinguishable from statements that this and other courts have held to be puffery," and holding that puffery does not create an express warranty under the Uniform Commercial Code); <u>Hubbard v. General Motors Corp.</u>, No. 95 Civ. 4362, 1996 WL 274018, at *6-7 (S.D.N.Y. May 22, 1996) (statement that vehicles were "the

19

most popular family of their kind anywhere" and "the most dependable, longest-lasting trucks" were puffery, and holding that puffery is not actionable under the Uniform Commercial Code); Berkebile v. Brantly Helicopter Corp., 337 A.2d 893, 903 (Pa. 1975) (advertising statement that helicopter was "safe", "dependable" and "easy to operate" constituted mere puffing as a matter of law).

Second, Mercer's interpretation would require UniLect to guarantee that the Patriot will comply with certification standards in the future that, in the present, are unknown and unpredictable. Shamos' report explained that the standards are constantly evolving. A seller would be unlikely to sell a product if it were required for the expected life of the mechanical elements of the product – here twenty to twenty-five years or more – to conform that product to unanticipated, unknown certification standards. Pennsylvania could in the future change the certification standards to prohibit the use of all DREs; under Mercer's interpretation, UniLect would have to supply any entirely new voting system at that time. The court concludes that such an interpretation is unreasonable.

The court finds that UniLect's interpretation of the Proposal's language is the only reasonable interpretation. Since the contract is only capable of being interpreted as UniLect argues it should, the contract is unambiguous. Accordingly, summary judgment in UniLect's favor is appropriate.

## B. Remaining Issues

Because the court grants summary judgment in defendant's favor based upon the certification warranty being limited to the date of delivery, the court need not consider the other

bases for summary judgment that defendant set forth.

## *Conclusion*

After reviewing the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the court concludes that there is no genuine issue of material fact presented and defendant is entitled to summary judgment as a matter of law.  The motion for summary judgment filed by UniLect will be GRANTED, and the motion for partial summary judgment filed by Mercer will be DENIED.

By the court:

  /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 17, 2009